KENT A. ADAMSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Adamson v. Commissioner
Docket No. 17447-80
United States Tax Court
T.C. Memo 1982-371; 1982 Tax Ct. Memo LEXIS 374; 44 T.C.M. (CCH) 327; T.C.M. (RIA) 82371; June 30, 1982
*374 Held, evidence obtained in a search and seizure, conducted by the Seattle Police Department and assumed for purposes of this case to have been illegal, is admissible in this Federal civil tax proceeding. United States v. Janis, 428 U.S. 433 (1976); Guzzetta v. Commissioner, 78 T.C. 173 (1982). Held, further, respondent's determination that petitioner received unreported income from dealing in narcotics during 1979 was not arbitrary and without foundation; the determination had a sufficient factual basis to cast the burden on petitioner to show that it was erroneous, which he has failed to do. John W. Flynn, for the petitioner. Wayne R. Appleman, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge *375 : The Commissioner determined a deficiency in the amount of $ 237,723 in petitioner's Federal income tax for 1979, together with additions to tax in the amounts of $ 11,886 under section 6651(a)[1] and $ 11,886 under section 6653(a). A jeopardy assessment of these amounts plus interest in the amount of $ 703.40 was made on April 24, 1980. The controlling issue in the case is whether respondent's determination of the deficiency was arbitrary and without rational foundation. That issue, in turn, depends in part upon whether certain records, controlled substances, and other materials seized by the Seattle Police Department after obtaining a search warrant, which is assumed for the purposes of this case to be illegal, were properly taken into account in determining the deficiency. FINDINGS OF FACT At the time the petition was filed, petitioner's legal residence was Poulsbo, Washington. Petitioner did not file a Federal income tax return for 1979. On January 29, 1980, a *376 branch of the Pacific National Bank of Washington, located in Seattle, was robbed by two black males. One of them was shot and captured by the police, and the other escaped. The Seattle Police Department (SPD) later that day received a report that a maid in the Camlin Hotel in Seattle, while cleaning room 423, had observed a large sum of money in a bank bag. SPD detectives and other officers of the Robbery Unit were dispatched to the Camlin Hotel, and they stationed themselves in the vicinity of the room. An affidavit (stipulated as a joint exhibit) for a search warrant prepared later that afternoon by a member of the SPD Robbery Unit states that a white man (Brian Lybecker (hereinafter Lybecker)) and a white female (Laurie Wilson (hereinafter Wilson)) came out of room 423 and were placed under arrest. Shortly thereafter, a second white male (petitioner) was seen looking around the corner in front of room 423, and he, too, was placed under arrest. Upon entering the room, SPD officers saw another white woman (Theresa Neilson) on one of the beds, and she was arrested. One of the officers opened a dresser drawer and observed a bank bag containing a large quantity of currency; another *377 officer looked in the drawer and observed what he, an experienced former narcotics detective, believed to be a cube of hashish. While the four individuals were in custody in the hallway outside room 423, SPD Detective Jorve entered the room, saw the currency, returned to the hallway, and "asked who the money belonged to." Petitioner stated that the money was his. The bank bag and currency were left in room 423 and SPD officers were left to guard the room pending issuance of a search warrant. The affidavit for the search warrant states that Lybecker had a brief case with him when he was arrested and that it was found to contain quantities of pills, marijuana, and hashish which appeared to be packaged for delivery. The affidavit also states that petitioner admitted having served 2 years in prison in California for a cocaine offense. On the same day that the arrests were made, a search warrant was issued by a judge of the District Court of King County, Washington, on the basis of probable cause to believe that the crime of "VIOLATION UNIFORM CONTROLLED SUBSTANCE ACT" had been committed and that evidence believed to be material to the investigation of the crime was concealed in *378 room 423 of the Camlin Hotel. The search warrant commanded a search of the premises "for the following evidence: U.S. Currency, one bank bag, hashish." The search warrant was delivered to Detective Jorve, and the search of the room was then made. Detective Jorve later that day, on January 29, 1980, returned the search warrant, reporting to the court that he had received the search warrant, had made a diligent search of the property and premises described therein, and had found the following: one brn. nylon travel bag w/personal items to Kent Adamson, one red suitcase w personal items and camera-Canon ser. # 102767, one plastic bag w/clothing, 5 rools [sic] of photographic film, one sack containing envelopes of paper seized from various locations, one sack containing 14 rolls of change, $ 55,250 in U.S. Currency, $ 1,282 in U.S. Currency, brown billfold with I.D. to Adamson, Personal checks to Adamson and $ 100, misc. change, one scale containing white powder residue, one brown leather purse with personal items to Adamson, green vegatable [sic] matter, hash, passport to Adamson, sifter, $ 3.86, one brown Sea 1st Bank Bag The trial record does not show that petitioner *379 was charged with any crime as a result of his arrest and the search. After petitioner and the other three arrested persons, as well as the items seized by the police, were taken to the police station, the Federal Drug Enforcement Administration (DEA) was contacted and an agent or agents from DEA examined the seized materials. The following day the materials were taken into DEA custody, and the DEA handled the investigation from that day forward. Also, shortly after the arrests and the search of the hotel room and property seizure were completed, agents of the Internal Revenue Service were called to examine the material that had been seized. A revenue agent made copies of the papers, including copies of a driver's license issued in petitioner's name; an Arizona birth certificate and a Blue Cross card both in the name of Jay Bentley; a driver's license, automobile insurance identification card, medical certificate, and a Federal Aviation Administration private pilot's license, all bearing the name of Jay Bentley and indicating they were issued in Tennessee; a $ 50,000 cashier's check dated October 26, 1978, payable to petitioner and drawn on the Idaho Bank & Trust Co.; a receipt *380 for $ 40,000, dated April 9, 1979, and signed by Wendy Hover; and papers showing the names of various individuals with identifying information such as race, weight, height, color of eyes, color of hair, and date of birth. The identifying information on most of these papers is basically similar to such information with respect to petitioner and Lybecker. The records seized by the SPD reflect payments for several sets of identification and orders for eight or nine more. Among the items seized were papers containing numerous figures and computations which the revenue agent used, along with other data, in computing the income tax deficiency determined in the statutory notice of deficiency. These papers constitute the records of someone involved in drug trafficking. The data and information relied upon by the revenue agent also included other documents seized when petitioner was arrested, discussions with DEA officers, the fact that petitioner had not filed an income tax return for several years, the fact that petitioner had been convicted of a narcotics offense, and the fact that petitioner was arrested in possession of narcotics, a large sum of money, and records of someone involved *381 in drug trafficking. The records seized at the time of petitioner's arrest, which belonged to petitioner, contain entries that constitute a type of inventory control for narcotics maintained on a transactional basis. Some of the transactions are dated (by months but not by years), and the dates are in months that had not transpired in 1980 at the time of the arrest. The records reflect lot shipments of marijuana and, in some cases, "tare" weight for the packaging materials. Some of the records mention mold problems with the marijuana. The records also reflect the exchange of United States currency for foreign currency. Using the papers seized in the hotel room the revenue agent computed petitioner's gross income for 1979 as follows: 1979
Computation of Gross Income and Business Expenses
Self
Gross
Net
Employment
Income
Expenses
Profit
Income
$    33,950
$    29,450
$   4,500
302,400
296,285
6,115
346,200
325,517
20,683
524,400
413,400
111,000
313,464
293,409
20,055
426
314
112
55,000
27,005
27,995
367,465
312,910
54,555
45,000
35,200
9,800
224,225
98,000
126,225 Totals for 1979
$ 2,212,530
$ 1,831,490
$ 381,040
$ 381,040
*382 These figures were carried forward into the notice of deficiency determining the deficiency here in dispute. OPINION The controlling issue to be decided is a narrow one: Whether the notice of deficiency issued by the Commissioner has a rational foundation. If it does not, petitioner must prevail. If it has a rational basis, the determined deficiency (subject to certain conceded mathematical corrections) must be sustained, because petitioner has not shown that he had no taxable income from dealing in narcotics in 1979 or (subject to the mathematical corrections) did not have as much income as the Commissioner determined. We hold for respondent. The long-established general rule is that the taxpayer has the burden of proving the Commissioner's determination of a deficiency to be wrong. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). In the ordinary case, the courts impose this burden of proof on the taxpayer without looking behind the notice of deficiency to examine the evidence used by the Commissioner or the propriety of his motives or administrative policies *383 or procedures in making the determinations reflected in the notice. Crowther v. Commissioner, 269 F.2d 292, 293 (9th Cir. 1959), affg. on this issue 28 T.C. 1293, 1301 (1957); Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327-329 (1974); Human Engineering Institute v. Commissioner, 61 T.C. 61, 66 (1973); Estate of Smith v. Commissioner, 57 T.C. 650, 656 (1972), affd. 510 F.2d 479 (2d Cir. 1975); Figueiredo v. Commissioner, 54 T.C. 1508, 1513 (1970), affd. per order (9th Cir. Mar. 14, 1973). Apart from the normal evidentiary rule imposing proof obligations on the moving party in litigation, the bases for imposing the burden of proof on the taxpayer include the presumption of administrative regularity; the likelihood that the taxpayer will have access to the relevant information; and the policy need to bolster the recordkeeping requirements of the Code. United States v. Rexach, 482 F.2d 10, 16 (1st Cir. 1973). The rule means that, ordinarily, the taxpayer has the burden of proving facts that under the applicable law require a result different *384 from the one proposed in the notice of deficiency. Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; Estate of Brimm v. Commissioner, 70 T.C. 15, 23 (1978). Some of the courts have, however, developed a limited exception to the general rule that the Commissioner must prevail unless the taxpayer proves that the deficiency determination is erroneous. The exception, apparently a reaction to what is perceived to be administrative excesses with respect to narcotics dealers, gambling operatives, and perhaps others determined to have received unreported income, requires the trial record -- at least in cases involving illegal activities -- to link the taxpayer to the alleged income-producing activity; otherwise, the determined deficiency cannot be sustained. [2] One case applying this exception is Weimerskirch v. Commissioner, 596 F.2d 358, 361 (9th Cir. 1979), revg. 67 T.C. 672 (1977), involving an alleged heroin dealer. The trial record in that case showed the method employed by the Commissioner in computing the deficiency, and that method involved the application *385 of information supplied to the Internal Revenue Service by confidential informants who did not testify. The trial record, however, did not contain evidence from which it could be inferred that petitioner realized income from narcotics sales. The court of appeals, holding that the notice of deficiency was arbitrary and without foundation, stated (supra at 361-362): The reason for the requirement that there must be some evidentiary foundation linking the taxpayer to the alleged income-producing activity is especially acute where, as here, the government asserts that the taxpayer was engaged in an activity which is otherwise illegal. This is particularly true when the illegal activity is not only morally reprehensible, but also punishable by an extended prison sentence. By its allegation that a taxpayer has unreported income from the sale of narcotics, the government is affixing a label, a label which in this case reads "heroin pusher." To allow the government to do this without offering any probative evidence linking the taxpayer to the activity runs afoul of every notion of fairness in our system of law. [3]
*386 Because the instant case is subject to appeal to the Court of Appeals for the Ninth Circuit, and without expressing any views on the standard it has established, we shall follow the Weimerskirch case in deciding the instant one. Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Under the Weimerskirch rule, we must examine the trial record and decide whether it provides an evidentiary foundation linking petitioner to income-producing activities in the form of the sale of controlled substances in 1979. If the trial record does not establish such a link, petitioner must prevail. [4]
*387 Although the revenue agents in preparing the notice of deficiency in the instant case obtained and considered information on petitioner's activities from the SPD and the DEA agents, the linkage of petitioner to drug-dealing, income-generating activities in 1979 in the final analysis rests primarily on the materials seized by the SPD in the search of room 423 of the Camlin Hotel, the events related to that seizure, and expert testimony as to some of the seized materials. It is necessary, therefore, to decide whether those materials are admissible in evidence in the instant case, United States v. Janis, 428 U.S. 433, 441 (1976), and, if so, whether they link petitioner sufficiently to income-generating narcotics activities in 1979. We hold that the linkage required by the Weimerskirch rule has been shown. 1. Admissibility of the Evidence Obtained in the Hotel Room Search
Petitioner's first contention is that the material seized by the SPD is not admissible in evidence because the search and seizure were illegal [5] and, if that evidence is not admitted, he must prevail. Respondent does not debate the validity of the search warrant but argues that, even *388 if the search and seizure were illegal, the evidence is admissible in the present Federal civil tax case. No criminal prosecution has thus far been initiated based on the evidence obtained in the seizure, and, therefore, no court has passed on the validity of the SPD action. For the purposes of our decision, we shall assume that the search and seizure did not comport with the Fourth Amendment and that, in a State or Federal criminal prosecution, the seized materials would have been suppressed and would not have been admitted in evidence. [6] There remains the issue as to the effect of the illegality of the search on the instant case, a Federal civil tax proceeding. *389 In United States v. Janis, supra, the Internal Revenue Service made a wagering tax assessment based exclusively upon evidence obtained by the Los Angeles police pursuant to a search warrant which, after a hearing as to the adequacy of the supporting affidavit, was quashed by the judge who had issued the warrant. The taxpayer contended that the evidence obtained pursuant to the search warrant could not be used to support the assessment. After carefully reviewing the history of the rule excluding illegally seized evidence, the Supreme Court held otherwise and stated (supra at 446) that the "prime purpose" of the exclusionary rule, if not the sole one, "is to deter future unlawful police conduct," citing United States v. Calandra, 414 U.S. 338, 347 (1974). The Court pointed out that denying admissibility to illegally seized evidence in either a State or Federal criminal trial frustrates the State officer, the primary object of the sanction, because his main interest is to obtain a criminal conviction. The Court declined, however, to impose the societal costs required to extend the exclusionary rule to Federal civil proceedings where the *390 evidence was illegally seized by a State criminal enforcement officer. The Court concluded that any interest of State criminal law enforcement officers in Federal civil tax proceedings is too attentuated to justify an extension of the exclusionary rule to such proceedings, stating as follows (428 U.S. at 459-460): We * * * hold that the judicially created exclusionary rule should not be extended to forbid the use in the civil proceeding of one sovereign of evidence seized by a criminal law enforcement agent of another sovereign. We conclude, therefore, in the light of this clear holding in Janis, that the records and materials seized by the SPD from the hotel room are admissible in evidence in the instant case. Petitioner cites Suarez v. Commissioner, 58 T.C. 792 (1972), where this Court applied the exclusionary rule to deny the admissibility of evidence illegally seized by a State police officer. In Janis v. United States, supra at 456-457, the Supreme Court indicated that it disagreed with the broad implications of this Court's reasoning *391 in Suarez because, among other reasons, this Court "did not distinguish between intersovereign and intrasovereign uses of unconstitutionally seized material." In Guzzetta v. Commissioner, 78 T.C. 173 (1982), this Court recently reconsidered the Suarez rule and (at 184) stated that: "To the extent that Suarez is inconsistent with Janis with respect to the application of the exclusionary rule, we will no longer follow our prior decision." Attempting to distinguish Janis from the instant case, petitioner argues that the search warrant was obtained by the SPD in bad faith and that "the almost immediate participation by federal agencies * * * require[s] application of the exclusionary rule * * * for purposes of deterrence." In Janis, the Supreme Court clearly indicated that participation by Federal agents in an illegal search might taint evidence seized for use in a Federal civil tax proceeding and reserved to the taxpayer the right on remand "to prove that there was federal participation in fact." Janis v. United States, supra at 455, fn. 31. The evidence in the instant case, however, does not show any Federal participation in the *392 search or seizure. See Black Forge, Inc. v. Commissioner, 78 T.C. (1982). The arrests and search in which the evidence in question was seized were carried out by the Robbery Unit of the SPD. As detailed in our findings, the police officers and detectives were responding to a report that a large amount of currency in a bank bag had been seen in the hotel room a few hours after a bank had been robbed in downtown Seattle. The first two persons (Lybecker and Wilson) to emerge from the room were carrying luggage and a brief case which could have contained the money stolen from the bank, and they were detained. Then, petitioner stepped from the room. He and, a few moments later, Theresa Neilson, were also taken into custody. One of the detectives went into the hotel room and saw the bank bag (from a bank other than the one robbed) containing currency and the hashish. Lybecker's brief case was searched and, according to the affidavit requesting the search warrant, found to contain "quantities of pills, marijuana, and hashish, which appeared to be packaged for delivery." Also according to the affidavit, petitioner admitted that he had served 2 years in prison in California *393 for a cocaine offense. At that point, the decision was made to seek the search warrant for the investigation not of a robbery but for a controlled substance violation. The warrant was obtained and the search was made by Robbery Unit detectives. According to the testimony, the property that was seized was taken to the offices of the SPD Robbery Unit. Only then was the SPD Narcotics Squad brought into the case. Neither the SPD Narcotics Squad nor the DEA was involved in obtaining the search warrant or making the search. A DEA agent, the first Federal agent to become involved, testified as to how he came into possession of the items that were seized as follows: I was contacted by Detective Pavlovich of the Seattle Police Department, Narcotics Squad, advising that they had arrested Adamson, Lybecker and two females, and along with, they had executed a search warrant and seized in excess of $ 50,000 in cash, records of transactions, and small amounts of narcotics. Subsequently, the IRS agents were invited to examine the seized materials. The testimony is thus unmistakably clear that there was no connivance or prearrangement between the SPD and the DEA or the IRS in making *394 either the search or the seizure. Neither the DEA nor the IRS agents shared in the enterprise of securing and selecting the evidence that was obtained. Only after the SPD had arrested the four individuals, including petitioner, and had taken possession of the property found in the hotel room were the DEA agents even told of the arrests and seizure. See and compare Lustig v. United States, 338 U.S. 74, 79 (1949); Byars v. United States, 273 U.S. 28 (1927). Because it is clear that there was no "federal participation" in the search and seizure, [7] the evidence does not support petitioner's charge, in substance, that the SPD was acting in concert with Federal agents. We need not, therefore, face the question whether an illegal intrasovereign seizure would have tainted the evidence. See Janis v. United States, supra at 455, fn. 31; Guzzetta v. Commissioner, supra at 180. *395 Petitioner would have us read the Janis opinion narrowly, so as not to cover the instant case. He points out that in the Janis case the local police obtained a search warrant directed at the seizure of bookmaking paraphernalia. The paraphernalia was seized, and the taxpayer was charged with violating the State gambling laws. Between the date of the seizure and the date of the trial, the Supreme Court rendered a major search and seizure decision which invalidated the warrant, necessitating suppression of the evidence. On these facts, the Supreme Court concluded that the local law enforcement officers would not be deterred from unlawful seizures by excluding the evidence in a Federal civil tax case. Petitioner argues that, because the warrant in the instant case was invalid under one or more of his several arguments enumerated in footnote 5, above, rather than as a result of a retroactive change in the law, the Janis rule does not apply. We do not agree. The Supreme Court's Janis opinion is not narrowly based. It is obviously an examination in depth of the entire problem of the effect of illegal searches and seizures by one sovereign on the admissibility of *396 evidence in subsequent civil suits in which another sovereign is a party. It clarified the rationale supporting the exclusionary rule -- holding that it is a deterrent sanction -- and concluded, as noted above, that State officers would not be deterred substantially from illegal searches and seizures by denying the admissibility of illegally obtained evidence in a subsequent Federal tax case. Nothing in the Janis opinion suggests that varying gradations in the illegality of search warrants obtained by State officers were intended to be weighed in deciding whether the exclusionary rule is to apply. 2. Adequacy of the Foundation for the Deficiency Determination
Contrary to petitioner's alternative arguments, we think the evidence seized by the SPD, coupled with other evidence admitted at the trial, was sufficient to provide a solid evidentiary "foundation linking * * * [petitioner] to * * * income-producing activity." Weimerskirch v. Commissioner, 596 F.2d at 362. The determination had a sufficient factual basis to cast the burden on petitioner to show that it was erroneous. When petitioner was arrested, along with three other individuals, there was *397 in room 423 over $ 56,000 in currency, which he admitted to the police detectives belonged to him. The evidence shows that petitioner had previously been convicted of distributing cocaine. Lybecker and his female companion were leaving the hotel room, carrying a brief case containing "quantities of pills, marijuana, and hashish, which appeared to be packaged for delivery." [8] Petitioner later emerged from the same room. According to the expert testimony of a DEA agent, drug traffickers deal almost exclusively in currency, using it to pay for shipments and receiving it for their sales. The records found in room 423, according to the DEA agent, were those of "someone involved in drug trafficking." He testified that: "normally only the larger traffickers will maintain any kind of record" and these records were "a fair example of record keeping." The records were maintained on a transactional basis. *398 The DEA agent identified recorded transactions as involving marijuana, hashish, and cocaine. Rough numbers reflecting gross receipts, costs and expenses, and net income from various transactions were recorded. The records also reflect conversions between United States and Canadian currencies. Taking these records, the revenue agent computed the income, expenses, and net profit figures set forth in the notice of deficiency. Among the records, drugs, and paraphernalia seized in the hotel room search were a long list of items designed to facilitate travel in the United States and abroad. These items included a Tennessee driver's license in the name of Jay Bentley which, the DEA agent testified, a search of computer records disclosed was not issued by that State. Also in the name of Jay Bentley were a Federal Aviation Administration private pilot's license, an Arizona birth certificate, and a social security card. The seized materials included, in addition, a passport in petitioner's name. These and other documents, some false and some genuine, are the types of papers which, according to the DEA agent's expert testimony, are used by individuals engaged in the travel required for *399 dealing extensively in narcotics. According to the DEA agent, the several sets of identification papers contain the physical descriptions of petitioner and Lybecker. [9] The items that were seized included other paraphernalia associated with drug dealing, such as scales (on which was found a "white powder residue") and a quantity of drugs. The large amount of currency claimed by petitioner, the records on drug transactions, the drugs on hand, the scales, the false and genuine identification papers, and other evidence found in the room all provide a basis for an inference that petitioner was engaged in illicit drug trafficking and earning money from his activities and was so engaged in 1979. We think also that the records provide a rational foundation for the determination of the amount of petitioner's income from such dealing. The revenue agent may have been mistaken in his conclusions as to the nature *400 of petitioner's activities or in his calculation of the amount of income, and it is true that the Commissioner did not undertake a bank deposits or net worth increase analysis to test or confirm the accuracy of the seized records. However, such possible errors do not destroy the rational foundation for the determination. Possible errors exist with respect to most deficiency determinations, but the burden of proving that the revenue agent erred rests with the taxpayer. [10]
*401 Petitioner makes a series of arguments to support his position that the evidence obtained in the room search, if it was admissible, was insufficient to show that the deficiency determination had a rational basis. First, he contends that respondent has not shown that the records used in computing the deficiency belonged to petitioner. He argues that those records were not tied to petitioner by signature, handwriting expert testimony, occupancy of the hotel room, or otherwise. As noted above, however, Lybecker was apprehended leaving the hotel room, and, according to the affidavit given to support the search warrant, he was carrying a brief case containing quantities of pills, marijuana, and hashish which appeared to be packaged for delivery. Scales containing residue of white powder were seized in the room. A reasonable inference is that Lybecker received the narcotics in room 423. Because petitioner remained in the room after Lybecker and Wilson left carrying luggage, it is also reasonable to infer that the room was being occupied by petitioner and that the remaining contents belonged to him. According to the return of the search warrant, [11] the records on which the revenue *402 agent relied were "seized from various locations" in the room when it was searched; it seems unlikely that the owner of records and other papers as sensitive as these documents on narcotics dealings would have left his room without taking security precautions. These facts add weight to the inference that the room was occupied by petitioner and that the records were his. Further, when the SPD detective asked who owned the currency in excess of $ 56,000 located in the room, as noted above, petitioner immediately claimed ownership. The currency was located in a closed dresser drawer, as petitioner has emphasized in his argument designed to show the search and seizure were illegal. It is hardly likely that one owning over $ 56,000 in currency would hide it in a dresser drawer in someone else's hotel room. Moreover, the police report filed by Officer D. J. Vandergiessen, [12] who searched the purse of Laurie Wilson when she was taken into *403 custody along with Lybecker on leaving room 423, shows that the purse contained a key to room 427. No other Camlin Hotel room keys were listed as having been found in the material that was seized. Again, the inference is that room 423, in which the seized evidence was found, was occupied by petitioner and the records belonged to him. Next, petitioner argues that the records, seized on January 29, 1980, do not show that petitioner had income in 1979. We note, however, that some of the transactions described in the seized records *404 bore dates in the months of October and November but without a designation of the year. Those months had not transpired in 1980 and the entries could not, therefore, have had reference to 1980 transactions. Taking into account the nature of the records and the consequent likelihood that they would be kept only as long as they served a useful purpose, we think it is reasonable to infer that the recorded transactions occurred in 1979. Certainly there is no evidence linking them to any other year. A possible error on the part of the IRS in the identification of the taxable year in which a transaction is taxable or the precise amount of taxable income derived from the transaction has never been regarded as grounds for holding a notice of deficiency to be without rational foundation. We sustain the determination that the income derived from the nine transactions recorded in the seized papers was taxable in 1979. [13]
*405 In sum, we think the Commissioner has established that his determination had a rational foundation and was not arbitrary. This was not a "naked assessment" but a determination clothed with much evidence of drug dealing activity: a large amount of currency, records of purchases and sales of drugs, paraphernalia for travel, a quantity of drugs, and even scales for weighing them. The only reasonable inference is that petitioner was engaged in illicit drug dealing and that such dealing was producing taxable income. Based largely on the seized records, the revenue agent computed a deficiency. He may have been partially, or even totally, wrong in his computations, but the admissible evidence shows that he had a rational foundation for his conclusions, which ultimately formed the basis of the determinations in the notice of deficiency. Petitioner, therefore, had the burden of proving that the notice was erroneous. He did not testify, and neither did anyone else testify, as to facts showing or tending to show convincingly that the determination was erroneous. Because petitioner offered no evidence to show that his failure to file a return for 1979 was due to reasonable cause, the *406 addition to tax under section 6651(a)[14] is sustained. Similarly, because he failed to show that part of the deficiency was not due to negligence or intentional disregard of the rules, we must sustain the addition to tax under section 6653(a). [15]
*407 Accordingly, respondent's determination is sustained; to reflect the conceded mathematical corrections, Decision will be entered under Rule 155. [16]
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted. All "Rules" references are to the Tax Court Rules of Practice and Procedure.↩
2. See Commissioner v. Shapiro, 424 U.S. 614, 635 (1976) (Justice Blackmun↩ dissenting). Insofar as the case before the Court is concerned, we need not reach the issue of whether the exception has a broader application. 3. Cf. United States v. Janis, 428 U.S. 433, 441 (1976); Llorente v. Commissioner, 649 F.2d 152, 156 (2d Cir. 1981), revg. in part and remg. 74 T.C. 260 (1980); Carson v. United States, 560 F.2d 693, 696, 698 (5th Cir. 1977); Gerardo v. Commissioner, 552 F.2d 549, 553-554 (3d Cir. 1977), affg. in part and revg. in part a Memorandum Opinion of this Court; Pizzarello v. United States, 408 F.2d 579, 584 (2d Cir. 1969). The Tax Court's views on this type of case were most recently stated in Jackson v. Commissioner, 73 T.C. 394↩ (1979), also involving an alleged narcotics dealer.
4. In Carson v. United States, 560 F.2d 693, 698 (5th Cir. 1977), which was cited in Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977), finding a wagering tax assessment to be without legal foundation for part of the period before the court, the court stated: We work no change in the burden or order of proof in wagering excise tax cases. We simply recognize that, at the close of all the evidence, if the record contains no item of proof tending to show that the taxpayer was engaged in wagering activity during the period assessed, the Commissioner's determination cannot prevail. The record before us contains no such predicate. * * *↩
5. Petitioner argues that the search and seizure were illegal on several grounds: (1) The search which led to the seizure of the evidence was premised upon an illegal arrest, citing United States v. McDowell, 475 F.2d 1037 (9th Cir. 1973); United States v. Shavers, 524 F.2d 1094 (8th Cir. 1975); (2) The hotel room was first searched without a warrant, citing United States v. Jackson, 533 F.2d 314, 319 (6th Cir. 1976), which in turn relied upon Vale v. Louisiana, 399 U.S. 30 (1970); (3) The affidavit given to obtain the search warrant was incomplete and misleading, citing Franks v. Delaware, 438 U.S. 154↩ (1978); (4) The warrant authorized a search for only "U.S. Currency, one bank bag, hashish" whereas a long list of items, some of which are listed in our findings, were seized. For the reasons stated in the text, we need not pass on these arguments. 6. See Ker v. California, 374 U.S. 23 (1963); Mapp v. Ohio, 367 U.S. 643 (1961); Elkins v. United States, 364 U.S. 206 (1960); Weeks v. United States, 232 U.S. 383↩ (1914).
7. The IRS activities were similar to those in United States v. Janis, 428 U.S. 433, 436-437 (1976), where the Supreme Court described the circumstances in which the IRS agent came into possession of the seized records as follows: Soon * * * [after the arrest], [Los Angeles Police] Officer Weissman telephoned an agent of the United States Internal Revenue Service and informed the agent that Janis had been arrested for bookmaking activity. With the assistance of Weissman, who was familiar with bookmakers' codes, the revenue agent analyzed the wagering records that had been seized and determined from them the gross volume of respondent's gambling activity for the five days immediately preceding the seizure. Weissman informed the agent that he had conducted a surveillance of respondent's activities that indicated that respondent had been engaged in bookmaking during the 77-day period from September 14 through November 30, 1968, the day of the arrest. [Fn. ref. omitted.]↩
8. This quoted language appears in the affidavit given by a SPD detective to obtain the search warrant. Although the affiant did not testify at the trial, the affidavit was admitted as a joint exhibit without any reservations as to the purpose for which it was offered in evidence.↩
9. The DEA agent testified that multiple sets of identification papers are helpful to large drug traffickers because DEA maintains a computer record of individuals suspected of drug dealing, and frequent changes in identification papers tend to help traffickers avoid detection.↩
10. In Carson v. United States, 560 F.2d 693, 695 (5th Cir. 1977), involving income from illegal gambling activities, the court dealt with arguments based on such possible errors in the Commissioner's determinations from gambling records as follows: We may best begin by recalling observations to which both taxpayer and tax collector here might have paid better heed: [W]e recognize that the absence of adequate tax records does not give the Commissioner carte blanche for imposing Draconian absolutes. * * * [However,] such absence does weaken any critique of the Commissioner's methodology. Arithmetic precision was originally and exclusively in [the taxpayer's] hands, and he had a statutory duty to provide it. * * * Having defaulted in his duty, he cannot frustrate the Commissioner's reasonable attempts by compelling investigation and recomputation under every means of income determination. Nor should he be overly chagrined at the [district court's] reluctance to credit every word of his negative wails. Webb v. Commissioner of Internal Revenue, 394 F.2d 366, 373↩ (5th Cir. 1968).
11. The detective who signed the search warrant return, which was admitted in evidence as a joint exhibit without reservations as to its use, testified as a witness; his testimony did not qualify his statements in the search warrant return.↩
12. In addition to the report of Officer Vandergiessen, the record contains other SPD written reports on the arrests and search of room 423, including the reports of Detective Jovre, who signed the search warrant return; Officer Cynthia L. Caldwell, who gave details of the arrests; and D. M. Kronk, who opened the dresser drawer in room 423 and saw the green bank bag and a large amount of currency. Written reports by police officers describing their observations in carrying out their duties are admissible in evidence in a civil trial. Rule 803(8), Federal Rules of Evidence.Baker v. Elcona Homes Corp., 588 F.2d 551↩ (6th Cir. 1978).
13. In Gerardo v. Commissioner, 552 F.2d 549 (3d Cir. 1977), affg. in part and revg. in part a Memorandum Opinion of this Court, the court of appeals found the evidence sufficient to cast the burden of proof on the taxpayer for one period (Aug. 5, 1966 to Feb. 3, 1967) but not for another period (Apr. 4, 1966 to Aug. 5, 1966); in response to an argument that the Commissioner erred as to the amount of petitioner's gambling income for the first period, the court said (supra at 556): It is not incumbent upon the Commissioner to show that no one except Gerardo received the lottery profits. Rather, it was Gerardo's burden to prove that others and not he alone shared the lottery proceeds. Gerardo, however, failed to sustain this burden. He presented no credible evidence to meet the Commissioner's presumption, and we therefore conclude that the Tax Court did not err in sustaining the assessment of the entire lottery proceeds to Gerardo. * * *↩
14. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax. --In case of failure -- (1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate; ↩
15. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. -- (1) In general. --If any part of any underpayment * * * of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩
16. Respondent has conceded that the records for two of the nine transactions on which the deficiency is based contain mathematical errors. Corrections of the amount of the deficiency will be made in connection with the Rule 155 computation.↩